## Fitch *v.* Brainerd.

In the Court below,

1805.

Day.
2d  163
70  110

ELIZABETH MARY FITCH, *Appellant ;* JEHU BRAINERD, Esq. *Appellee.*

THIS was an appeal from a decree of probate, approving the will of *Abigail Mary Brainerd.* It contained a devise of real estate to her husband ; and the only exception relied upon was, that she was a feme-covert, when she executed it. The Superior Court affirmed the decree.

*A will, executed by a feme-covert, devising real estate to her husband, is void.*

*Smith*, (of Woodbury,) and *Edwards*, (of New-Haven,) for the plaintiff in error.

The estate in question is claimed, by one party, as devisee, and by the other, as heir at law. As neither has paid any consideration for it, the claims of both, in natural justice, are equal. Natural justice only says, that when the last occupant has done with property, it shall go to the person to whom the policy of the law gives it.

The question of law, which the record presents, is, whether a feme-covert can devise her real estate ?

This general question will be discussed, by examining, first, what are the PRINCIPLES which govern it ? And, secondly, how far those principles have been supported, or shaken, by PRECEDENTS ?

The legislature, by their various acts, have virtually declared, that a feme-covert cannot make a will.

At an early period, the General Assembly passed an act, authorizing all persons of sound mind and memory, who

1805.

FITCH
*v.*
BRAINERD.

had arrived to the age of twenty one years, to make their wills. This act continued, without any alteration, through various revisions of the statutes, until that in the year 1784, when the words, " not otherwise legally incapable," were inserted. At the original passing of this act, an exception of femes-covert would have been futile ; for, at that time, and for many years afterwards, the whole property of a feme-covert, real as well as personal, vested absolutely in her husband. She could, therefore, have no property to devise. But, at the revision in 1784, her condition was changed. The act protecting " Heiresses" had, before that time, been passed, by which the lands of a feme-covert were secured to her, and her husband could no longer alienate them without her consent. (*a*) It, therefore, undoubtedly occurred to the legislature, that to continue the act, without excepting femes-covert, while they were capable of holding lands, might raise a doubt, whether they were not comprised in the general clause, " all persons." The legislature, indeed, could not have entertained an opinion, that any general words, empowering persons to devise, could be construed to comprise femes-covert. The framers of this act certainly could not have had them in view, not only because, at the time of its passing, they neither had, nor could have, any property to devise, but also because they had no legal existence, were not " persons" in law. The statute 32 *Hen.* VIII. empowers " all and every person and persons to will " and devise ;" but these general words have always been construed to comprehend such persons only, as by the rules of the common or statute law could, previously, alienate their lands. (*b*) The statues of Massachusetts (*c*) and New-Hampshire, (*d*) respecting wills, contain expressions equally broad, and have been construed in the same manner. Yet, the legislature, from abundant caution, deemed an exception expedient. The words, " not otherwise le-" gally incapable," were, therefore, inserted, which were intended, at once, to except femes-covert, and to exclude

(*a*) *Stat.* 265. *edit.* 1796.        (*b*) *Pow. Dev.* 140,1.
(*c*) *Stat. Mass.* 109.                (*d*) *Stat. N. Hamp.* 233.

any implication, which an exception in a different form might have raised, that they were empowered to devise, by the general words in the old law. If the exception does not refer to femes-covert, what possible meaning can it have? There are, certainly, no *other* persons in society, of twenty one years of age, and of sound mind and memory, who are legally incapable of making their wills. That the legislature should make an alteration in a statute, without any object in view, is not to be admitted.

It ought, furthermore, to be remarked, that if femes-covert are, by our statute, enabled to devise, they are equally capacitated, not only to alienate " their lands and " other estates," but " to give their vote, verdict, or sen-" tence, in any matter or cause ;" (e) they may vote in free-man's-meeting, may be jurors, and may even be judges of the courts. The evident absurdity of such a conclusion is a clear proof, that it was not intended by the legislature. But, to guard effectually against it, the legislature have said, that the powers granted generally by the statute, are not granted to those, who are otherwise incapacitated, than by want of age and understanding, to exercise those powers. If the exception cuts off the power of femes-covert to vote and to judge, it also cuts off their power to devise.

If, then, we discover the sense of the legislature to be opposed to the power contended for, it puts an end to the question.

But admit, for the sake of argument, that the statute does not determine the question in our favour. It certainly cannot be construed to operate, in the least, against us. It only authorizes persons " of the age of twenty-one years," and " of right understanding and memory," who are " not other-" wise legally incapable," to make their wills. No person,

(e) *Stat.* 23. *edit.* 1796.

1805.

FITCH
v.
BRAINERD.

therefore, who was "legally incapable" before, or aside from the statute, derives any power from it.

The question, then arises, whether a feme-covert can, without the aid of the statute, or, at common law, devise her real estate?

In the inquiry on this subject, the common law of Connecticut will be principally regarded; for we have, it is conceived, a common law of our own.

When our ancestors first settled this country, they looked up to the great LAW-GIVER OF THE UNIVERSE as their immediate legislator; and from *him* they learned, that when two persons are married, *of twain they become one flesh.* But, two persons cannot be formed into one, unless the legal existence of one of them be *suspended*; and, if a doubt could exist, which of the two should retain the sole legal existence, and be the head of the family; that doubt is solved, by the same high authority. So strongly, indeed, were our ancestors impressed with the necessity of a perfect union between husband and wife, that, without any statute on the subject, they adopted every principle of the ancient common law of England, which went to establish such union. The right of a feme-covert to hold lands, which, by the English common law, forms an exception to the entire union of husband and wife, was, at the same time, rejected here. Our ancestors admitted of no exception. The whole estate of the wife, both real and personal, vested absolutely in her husband. These principles, being adopted by general consent, in obedience to what was supposed to be the divine law on the subject, became a part of the common law of Connecticut, and so remained for nearly a century. In the year 1723, " An act for preventing the sales of the " real estates of heiresses without their consent" (*f*) was passed, by which one exception was made to the matrimonial union. By this statute, a legal existence was so far

(*f*) *Stat.* 265. *edit.* 1696.

given to the wife, as to enable her to hold the fee-simple of
lands, to be enjoyed after the coverture should be deter-
mined, and to enable her to sell them, with the consent of
her husband. Her being enabled to hold lands, provided
she could exercise no act of ownership over them, during
coverture, would have been of but little consequence ; but
her being enabled to exercise a power in the sale of them,
during coverture, formed a new feature in the marriage
covenant. For this, however, there was a strong reason ;
the family might want the avails of them for support. The
sale, also, is to be guarded by an acknowledgment before
a justice. This shews, with how much caution our an-
cestors intermeddled, in any degree, with that *sacred connex-
ion*, when even the measure seemed to be dictated by the
strongest necessity.

Here let us pause, and inquire, whether, before the stat-
ute alluded to, it would have been in the power of a Court,
without legislative aid, to have given any degree of legal
existence to a feme-covert, so as to have enabled her to hold
lands, or transfer them, in any manner whatever? In at-
tempting it, they would have violated principles, which had
been held sacred from the first settlement of our country.
Instead of conforming to the law of the land, they would
have trampled upon it. They would have assumed the pro-
vince of legislators, and departed from that of judges. In
vain would it have been to urge the law of England, that a
feme-covert may hold lands, and convey by fine. The an-
swer would be obvious. With regard to this subject, our
ancestors have adopted principles directly opposite to the
law of England, and they must be binding on our courts,
until altered by statute. It was in pursuance of these ideas,
that the legislature actually made the statute, which forms
one exception to what was formerly the general law on this
subject. If, then, no court had the power to form one ex-
ception to what had become the general law of the land, is
any court, we ask, now at liberty to add another without the
aid of a statute? When a statute has formed one exception

1805.

FITCH
*v.*
BRAINERD.

to a general principle, does it not, in all other respects, remain as it was before? If a statute was necessary to enable a feme-covert to convey by deed, is it not equally so to enable her to convey by will? And here, again, we clearly discover the sense of the legislature on this subject. Had they supposed, that a feme-covert could make a will, as they were about to enable her to make a deed, it is inconceivable, that they should have taken care to regulate the one, and not the other;—that they should have taken care to protect her in making deeds, and yet afford her no protection in making wills. Her deed is commonly made in health; she acknowledges it, in person, before a magistrate; it is placed upon the public records; the possession of the property is changed. All these are circumstances, that give notoriety to the transaction. When it reaches the ears of her friends, she is in existence, to inform them of any abuse she may have received. But, the will makes its appearance, for the first time, when the maker of it is *no more*. She can, now, give no account of the intolerable abuse she may have suffered before she consented to make it. Let it, also, be remarked, that she is in the power of her husband, *while alive*.

If the remarks, already submitted to the Court, wanted any further support, it would be found in the consideration, that when our ancestors first settled this country, they emigrated from a country where the law was perfectly well established, that a feme-covert could not devise her real estate. If it be said, that this law was established in England, by statute; yet admitting the fact, it takes nothing from the force of the argument. Our ancestors had been educated with habits of thinking conformable to what was the law; and whether the law had legislative sanction, or was evidenced by the adjudications of courts, would make no difference. Nor, indeed, is it at all probable, that one to a thousand of them knew, that any statute had been passed on the subject. The only reason, why the law of England, has any binding force here, is, that it is supposed to have been adopted by general consent; and this holds no less

strong, with respect to statutes in being, at the first settlement of the country, than with respect to the common law. It cannot be supposed, that persons who had lived to years of manhood, in a country where the law was perfectly well settled, that a feme-covert could not make her will, would, immediately on removing to another, adopt notions and customs directly the reverse. They would, of course, adopt the law of the country, whence they emigrated ; and must be supposed to have adopted it, with regard to the power of a feme-covert to devise.

But the common law of England will afford our opponents no support. It is as much opposed to the doctrine, which they contend for, as the statute of 34 *Hen.* VIII.

That the legal existence of the wife is suspended, or incorporated with that of her husband, may be proved, by innumerable English authorities ; but it may be sufficient to refer the Court to the very explicit language of Judge BLACKSTONE on this subject. " By marriage, the husband " and wife are ONE PERSON in law ; that is, the very *being* " or *legal existence* of the woman is *suspended* during the " marriage, or at least is *incorporated* and *consolidated* " into that of the husband." (*g*)

Coverture was a disqualification of devising at common law. (*h*) So far has this doctrine been carried, that a custom for a feme-covert to devise was holden to be ill, because it could not have had a lawful commencement. (*i*) Indeed, the very making of the question, whether a *custom* for a feme-covert to devise were good, shews, that she could not devise by the general common law of the land.

But our opponents will say, that a feme-covert can appoint a trustee to a trust estate ; that she can devise her husband's personal estate, with his consent ; that, with his consent,

(*g*) 1 *Bla. Com.* 442.        (*h*) *Pow. Dev.* 141, 146.
(*i*) *Pow. Dev.* 147, 148.

Y

1805.

FITCH
v.
BRAINERD.

she may also devise her choses in action ; and, that she can even make an appointment, in pursuance of marriage articles.

What then ? The question is, whether she can devise her *real estate ?* If she cannot make a will of the *kind* in question, it is very unimportant what else she can do.

All the cases mentioned proceed upon the ground, that she has not a general disposing power. Though she has no power in herself, she can exercise a power derived from another, in appointing a trustee ; though she cannot dispose of her husband's personal estate, yet *he* may dispose of it, and when he consents to her disposition, it becomes, substantially, his own. The same may be said of her choses in action. The husband, during coverture, has absolute power over them, either to collect them, or to give them away ; and his consent, during that period, to any disposition of them, amounts, substantially, to a disposition by him. As to the appointment in pursuance of marriage articles, it is only the exercise of a power, with which he has vested her ; the power of doing an act, which he has covenanted shall be binding on him. The same power might be given to a child of ten years old, and the act done by him, in the exercise of it, would be equally binding.

After all, it must be admitted, that although the general common law of England has established the most perfect union of husband and wife, beyond the possibility of doubt ; yet there has been a constant struggle, in that country, against what has been considered the tyranny of the marriage yoke. And, within a century past, a system of separate property has been introduced, which has become very general, whereby the wife is enabled to hold property, to her *sole* and *separate* use, independent of her husband, and as to which, she is, to all intents and purposes, a feme-sole.

The causes, which gave rise to this system, are obvious. The English borrowed their notions of jurisprudence, in a

great degree, from the civil law, by which " the husband and
" the wife are two distinct persons ; and may have separate
" estates, contracts, debts and injuries ; and, therefore, in
" the ecclesiastical courts, a woman may sue, and be sued,
" without her husband." ( *j* ) In these courts, which continue
to be governed by the civil law, she has been constantly con-
sidered as a distinct person from her husband. That notions
of independence in wives should prevail in England, will
not, therefore, appear strange to us. These notions, intro-
duced by the civil law, have been encouraged by family
pride, supported by overgrown wealth, and extended by dis-
sipated manners and corrupt morals.

If we examine the cases on the subject of separate pro-
perty, as they have occurred, we shall find, that they com-
pose a system, which has almost entirely grown up within
the last century ; and, that the courts have been driven into
it, by degrees, in consequence of the habits and customs of
the nation. Once in a while a judge would set his face,
like a flint, against the progress ; but a single precedent
would be soon overwhelmed in the torrent. At length,
Lord MANSFIELD, in the case of *Corbett* v. *Poelnitz*, ( *k* ) took
the last step, and declared, that as new customs and habits
prevailed, new principles must be adopted ; and adjudged,
that, as to her separate property, a feme-covert might sue
and be sued as a feme-sole. Since that decision, however,
there has been an attempt made by the court to retrace
their steps ; and the case of *Marshall* v. *Rutton* ( *l* ) was, on
great deliberation, decided the other way. But, the courts
in that country will struggle against the progress of this
system in vain ; the evil has taken too deep root ; it per-
vades the whole nation. Cases will doubtless be cited to
shew, that a feme-covert may devise her separate property.
But the same cases will shew the reason. It is, that as to her
separate property she is a feme-sole ; and, to be sure, if she
can be considered as a feme-sole, she can devise of course.

( *j* ) *Bla. Com.* 545.　　　( *k* ) 1. *Term Rep.* 8.
( *l* ) 8 *Term Rep.*

Whatever may be thought of that system, which exists in England, of settling property on the wife, to her sole and separate use, it can reflect no light on the question, *what is the common law of Connecticut?* because it has grown up, in that country, since our ancestors left it, and, of course, could have had no influence on the ancient customs of this State. Besides, the inheritance of a feme-covert has never been considered as her separate property, unless secured to her, in some way or other, to her sole and separate use. No case can be found, deciding, that as to her inheritance she may be considered as a feme-sole, or that she has power to devise it. But, this Court are now called upon to follow the English system of separate property as far as it goes, and then to take a leap in the dark.

The principle insisted upon by our opponents, and which must be adopted, if they prevail, is, that as to the interest of a feme-covert in land, which does not vest in her husband, she may be considered as a feme-sole. It follows, as a necessary consequence, that she may sell it to him, or to any other person, without his consent; and the avails, upon the same principle, must be her separate property, with which she may speculate in new lands, traffic in goods, or sport at the gaming table.

The will, indeed, does not take effect, until coverture is determined; but it must be good at the time of making it, or never; and the same disabilities, which render persons incompetent to make any other disposition of property, render them equally so to make a will. (*m*)

The doctrine, which we contend against, is not only novel in this State; but is of very dangerous tendency. It is no less opposed to sound policy, than to the principles of the common law.

The harmony and good order of society result naturally

(*m*) *Pow. Dev.* 173.   11 *Mod.* 122, 123.

from peace and harmony in families, which will no where be
found, without an entire union of interests between husband
and wife.    Our happy state of society, of which we fre-
quently, and very justly, boast, will be found to rest, in a
great measure, on that domestic harmony, which is produ-
ced only by the two heads of the family becoming emphatical-
ly *one*.    The difference between a state of things to be found
in England, and what has, hitherto, existed in this State, is
too striking to pass unnoticed. In that country, marriage ar-
ticles, securing property to the independent use of the wife,
have been common for a considerable period ; and it has also
been common, whenever any relation was about to give
property to a female, to secure it to her, through the medi-
um of trustees, to her sole and separate use ; until very
little property, belonging to females, remains subject to the
general law of coverture.   The wife, by the aid of her
friends, has been enabled to evade that law, and has truly
obtained her  boasted independence, in its fullest extent.
And what has followed ? Precisely what might have been
expected ;—divorces *a mensâ et thoro*, and articles of sepa-
ration ; until nothing is more common, than to see my lord
at one country seat, and my lady at another, pursuing, res-
pectively, their own affairs, in their own way—but to the
benefit of nobody. In this State, marriage articles have
scarcely existed.  No property has been settled on a female,
to her sole and separate use, independent of her husband.
To the honour of females, in this State, they have despised
the  idea of withholding their property from a man, with
whom they would trust their persons ; and no better way
has been devised of assisting a female friend, than to assist
her husband, in whom all her wishes and prospects center.
The consequence has been, that no articles of separation
have appeared, and but one divorce *a mensâ et thoro* ever
heard of, in the State.   A comment cannot be necessary, to
shew the impropriety of adopting principles, tending to es-
tablish interests, views and prospects, in married women,
independent of, and distinct from their husbands.

1805.

FITCH
*v.*
BRAINERD.

HARVARD
LAW SCHOOL
LIBRARY

174

But, let us follow this independent lady, and see her exercising the *rights of women.* She can make a will to her husband, say our opponents. On the same principles, she may sell to him; and, if he fail to pay, she must have the right to sue him; he may claim to have made a *private settlement;* a bitter law-suit must be the consequence, with their different counsel, and different witnesses.

Again: She may make a will to her husband, say the gentlemen. On the same principles, she can make a will to any other person, against his wishes; and, after procuring her scrivener and witnesses, for this purpose, she may want an apartment in the house to do the writing in; but the house is his; and he may intrude upon them, though, as the will is to be made against his wishes, he may be, of all others, the most unwelcome. He may finally turn them all out of doors; and what is this independent lady to do then? Why, as the law has given her the right to make her will, it implies every other right necessary to accomplish it. Of course, she must turn him out, the moment he intrudes; and, if he still interrupts her, she must sue him, and recover exemplary damages!—This is too ridiculous.

But, perhaps it will be said, that the wife may make a will according to her husband's wishes, and then secretly, and without his knowledge, make another. This mode would not be adopted, it is presumed, by many females in this country; for no woman, governed at all by moral principles, after having made a will agreeable to her husband's wishes, and thereby raised expectations, and virtually declared, that such should be the disposition of her property, would secretly depart from it. The whole transaction would be an imposition on the husband, at which most women would shudder. It would be strange, that a woman should enjoy a right, and at the same time, be driven to such means to exercise it. Besides, the husband, who had brought his wife to make a will in conformity to his wishes, in her last

sickness, would be likely to seclude her from her friends, if he were liable to be tricked in this manner.

But, perhaps it will be said, that the husband, in his last sickness, is, also, in the power of his wife; and he is, nevertheless, competent to make his will. Were that state of things to be introduced, which the principles of our opponents lead to, there would, indeed, be danger; for, only give married women notions of separate property, and habits of managing it for their separate use, and their husbands, when enfeebled by sickness, would not be safe in their hands. But, to a woman, who had confided the whole concerns of property to her husband; to whom such a thing as separate property had never been known; and whose wishes had all been in unison with his through life ;—to such a woman, *how to get her husband's property* would be the last idea, which would occur, on seeing him on a death-bed.

Could any great benefit be promised to society from allowing femes-covert to devise their estate, the many evils resulting from it might be encountered; but so far is this from being the case, that it is doubtful whether sound policy dictates the making of wills at all; certainly the reason urged in favour of making them does not apply to femes-covert, as their industry adds nothing to their property.

We have endeavoured to establish the general principle, that a feme-covert can make no will, either *with*, or *without* her husband's consent; but as it respects this case, we might safely admit her to be competent, *with the consent of her husband*, the devise in question being directly to him. For, whenever the law makes a man's consent necessary to the transfer of property, he cannot receive it, by force of such his consent, as grantor. The law will never permit a man to act in the double capacity of devisor and devisee. To place a husband as the guard over his wife's conduct, and make his consent necessary to a transfer of her property, and yet allow him, in his abundant wisdom and good-

ness, to take it himself, and then claim under his own act, as grantor, or devisor, is an absurdity too glaring to need refutation.

Having examined the principles, which are involved in this case, we beg leave to direct the attention of the Court to the precedents.

The case of *Kellogg* v. *Adams* (n) will doubtless be insisted on, as settling the question in favour of the power, which we oppose. But let us, in the first place, inquire, why are precedents resorted to? A remark of Lord MANSFIELD is full to this point: " *That precedents do not govern cases ;* " *they only serve to illustrate principles ; and principles* " *govern cases.*" What then are the Court to do with a single precedent, which is opposed to every principle of law? The answer is obvious. They are bound, by their oaths of office, to disregard it, and to decide according to law. The precedent, however, will have its due weight, in proportion to the soundness of the reasons, on which it was founded, and the number and respectability of the judges, who acted upon it. In the case of *Kellogg* v. *Adams,* it is a little remarkable, that no reasons are to be found for the reversal of the judgment of the Superior Court, while the most forcible ones are preserved in support of it. (o) It would be indelicate in counsel to make any remarks respecting the comparative merits of the gentlemen, who gave judicial opinions in that case; but it may, with propriety be remarked, that the number of judicial opinions, given at that time, were in favour of the principles, for which we contend; for, while the Superior Court were unanimously opposed to the power of a feme-covert to devise, the Supreme Court of Errors were nearly equally divided on the question.

Nothing is more common in England, than for judges to declare, that former precedents are not law. Many cases

(n) *S. C. E.* 1788.                    (o) *Kirby* 193 *and* 438.

might be cited to prove this; but the case of *Marshall* v. *Rutton*, already cited, shews sufficiently, with how much facility they can depart from former precedents. This Court did the same, some years ago, in two cases in favour of *Bacon* against *Porter*. They were both actions on notes of hand, with precisely the same plea to them. One of them came before this Court, (*h*) and they decided against a recovery; afterwards, the other came up, (*q*) and they decided directly the other way. The case, also, of *Bradley* v. *Goodyear*, (*r*) decided recently, and within the recollection of the present judges, as well as that of *Sherwood* v. *Salmon*, (*s*) decided this term, prove, that this Court can depart from precedents, which stand opposed to principles.

If it be said, that this introduces that uncertainty of the law, so much complained of; we answer, that the evil lies not in the law, which is as sure as time, but in the imperfection of human nature, and the difficulty of discerning what is the law. Every judge, however great, is liable, at times, to come to a wrong determination, from a partial view of the ground; and it is much safer, on the whole, to be guided by principles, which cannot err, than to follow precedents so liable to mistake. A long course of uniform decisions may, indeed, be considered as establishing a new principle; and, in that case, it is obvious, that it is very unimportant, whether you follow the precedents, or the principle which they establish.

It has been a considerable time, since the decision, in the case of *Kellogg* v. *Adams*; no other case has ever come before this Court, until now, for a revision of the subject; the Superior Court have never receded from the ground they took in that case, until this case came up. No prudent lawyer would ever advise, from such a state of things, in favour of the capacity of a feme-covert to make her will.

<div style="margin-top:1em">

(*h*) *S. C. E.* 1790.          (*q*) 1 *Root.* 370.
(*r*) *Ante*, vol. 1 *p.* 104.          (*s*) *Ante, p.* 128.

</div>

1805.

FITCH
*v.*
BRAINERD.

The most that he could say, would be, that a divided Court of Errors have so decided ; but their opinion was opposed to an unanimous opinion of the Superior Court, and is also opposed to every principle of law. If however, any persons have been mistaken, in consequence of the former adjudications, in supposing that they could hold property under the will of a feme-covert ; it is peculiarly fortunate for the correction of such mistake, that they can suffer no injustice from it, as they have paid no consideration for the property ; and to decide upon correct principles, now, does no more, than cast the property, where, of course, it ought to go.

The case of *Kellogg* v. *Adams* came before this Court, at the close of the revolutionary war ; a period peculiarly fitted to produce a decision, tending to loosen the bands of society. Suppose, that a single adjudication had, at that period, taken place in pursuance of the civil law, and in opposition to the law of England and of this country, that a woman's personal estate did not vest in her husband, on marriage ; would the Court now consider themselves bound by that precedent ?

But why talk about the case of *Kellogg* v. *Adams* since that of *Dibble* v. *Hutton*, (*t*) decided by this Court, a year ago, by an unanimous opinion ? In that case, the wife joined with her husband, in a sale of her lands, upon an agreement, that the husband should take notes for the purchase money, and when collected, the money should be secured to her sole and separate use. The notes were delivered to her as security. He died, and she brought her petition to enforce this agreement against the administrator. But this Court decided, that no such agreement could be made, on the broad principle, that a feme-covert is incapable to perform any legal act, except the single one pointed out by statute. In that case, there was a strong equity in her favour, though principles of law were too stubborn, to permit the Court to listen to it.

(*t*) *Ante, vol.* 1. *p.* 221.

Now, to say, that a feme-covert can have a legal existence when giving to her husband, without any consideration, and yet say, that she has no legal existence, to take benefit of a solemn contract, made in her favour, for which she has given, and he received, a most valuable consideration, would be a system of jurisprudence, to say no worse of it, not much in favour of the female sex. The truth is, these two precedents cannot stand, and both be considered as law ; for one goes to destroy a principle, which the other sets up. And it is cheerfully submitted to the Court, to elect which of the two they will support.

*Ingersoll,* and *Daggett,* for the defendant in error.

The question in this case is, can a feme-covert devise her real estate, with the consent of her husband ?

On this question, it is not to be expected, that any thing new can be said, as it has received a discussion from some of our ablest lawyers.

Little, or no evidence is to be found, on the subject of devises of real estate, before the Norman conquest. During the prevalence of the feudal system, no person could devise real estate, the principles of that system being opposed to this doctrine. Our inquiries may, then, properly commence with the British statutes relating to wills.

In 1541, and in 1543, two statutes were made, *viz.* 32d and 34th of *Hen.* VIII. whereby it was enacted, " that all " persons, being seised in fee simple, except *femes-covert*, " infants, idiots, and persons of insane memory, may, by will " and testament, devise two thirds of their lands in chivalry, " and the whole of those held in socage."—The statute law of England, then, is clearly against the power in question.

But, what is the law in Connecticut ? The statutes above recited have no force here.—No English statute, *as such,* is

<div style="text-align: right;">
1805.

FITCH
*v.*
BRAINERD.
</div>

of any authority.—Constructions put, by their courts, on their statutes, are considered by our courts as constructions upon similar statutes, passed with a knowledge of such constructions.—Thus their decisions on the statute against frauds and perjuries, are read here as authorities, and with propriety.—The common law of England, also, is our law, in cases, to which it has been extended ; and, it will be admitted, in all other cases, where a difference of circumstances, does not clearly warrant a departure.—It is, however, to be remembered, that where we have a statute regarding any subject, *that* is to govern.

We have a statute authorizing devises of real estate, made before 1672, when the first statute book which is to be found, was printed.—With both the English statutes before them, our legislature made the law of Connecticut ;—it was copied almost literally from theirs, and contains *all* the exceptions, but that of *femes-covert.* It may be asked, why that exception was omitted. Suppose, in the English statutes, clergymen had been prohibited, and ours had been silent as to them ; would not the argument have been strong, that they were authorized ?

On the revision of our laws, in 1784, our statute was re-enacted, with an addition of these words after the exceptions, *viz.* " not otherwise legally incapable."

It has been strongly insisted, that these words took away from femes-covert the power of devising, if they possessed it before.—But is this fair reasoning ? It is not to be presumed, that the legislature of 1784 intended to devest an important right, by such a clause inserted in a parenthesis, and liable to so much just criticism.—But what is the clause ? Does it create a new disability ? Its language is " not otherwise legally incapable." The obvious meaning is, that persons who were *before incapable of devising,* should remain *incapable.* The incapacity, then, is an incapacity of devising *generally* ;—not of devising *real estate,* for, at common law,

*all* were incapable of that, and men equally with women.
Hence, the true question is, were femes-covert, at common
law, incapable of devising things, which might be devised
by *men, viz.* personal property? If they were, this statute
is prohibitory, in the case under consideration.

What is the incapacity of a feme-covert? Not idiocy,
nor insanity, nor want of discretion; for, in these, to say
the least, they are competent;—nor want of will, properly
so called; for she may dispose of all her estate with her
husband; she may sell and devise under a power; she
may be punished for offences, to the commission of which
freedom of will is essential.

The reason generally given, is, that she is *sub potestate
viri*; but this operates with equal force against her convey-
ance, in Great-Britain, by fine, and here, by deed; and yet
both are acknowledged and established, beyond debate.

It is said, however, that deeds are acknowledged, and re-
corded, and hence become a matter of notoriety;—but a
deed receives no part of its force, as between grantor and
grantee, by being recorded; and, as to its notoriety of execu-
tion, it is difficult to see how it is more so, than that of a
will;—they each require the presence of three persons,
not parties.

But the feme-covert, in Great-Britian, is to be examined
*separately.*—What security is this against the persuasions of
affection, or the force of tyranny? The lord and master,
who can bring his wife to the threshold, rarely stops there.

It is also said, that the power of a feme-covert to alienate
by deed, arises out of the necessity of the case. This posi-
tion is unsupported by any authority, nor does the practice
here, or in England, warrant it.

The reasons in favour of the power in question are as for-
cible in the case of women, as men. It is not necessary to

discuss the question, whether this is a natural right ;—it certainly results from the most correct and sound principles, by which property is regulated. And why may not a woman, equally with her husband, reward the affectionate treatment of a kind relative, rather than see her property descend to those, who have been perverse, unkind, or cruel ? Must she, *at all events*, submit to the thought, that a kind husband is to be beggared, to aggrandize a cousin of the tenth degree ?

It is said, however, that the power of devising is not favoured in Great-Britain.—True ;—and what is the reason ? It is given in *Wild's case*, (*u*) and is in these words : " The " law did favour the heir, because he was to sit in the seat " of his ancestor, and to serve the King and Commonwealth, " in as good estate, as his ancestor did ;"—proper language, indeed, in that country, but, in no degree, applicable here.

Nor is there any just ground, to apprehend any great evils, from the principle for which we contend.—Does experience teach us, that women can be coerced to disinherit *their children ?* It is believed that such would be a most singular occurrence. If, however, the power of a husband is so great, as to compel a devise, will he not, with the same power, compel a disposition equally injurious, and more sure ? Her *devise* is revocable ;—her *deed*, irrevocable.

We find, then, the disability spoken of not to arise from idiocy ; insanity ; indiscretion ; defect of will ; any impropriety, in preferring one relative to another ;—or in devising generally, so that the heir at law may be cut off ; nor from any peculiar inconvenience, which will not apply to any other conveyance.

Since the only ground assumed is, that a feme-covert, from the marriage relation, is *sub potestate viri ;* the disability is as extensive upon her power, as that relation is op-

(*u*) 6 Co. 17.

erative upon her rights, and not more so. This is the rule, in all analogous cases ; such as where men are under overseers, masters, conservators, &c. It is, also, a rule of right reason. Hence we insist, that when a feme-covert, by the common law, has property, over which she may exercise a *disposing power, without affecting the rights of the husband*, she may, by the same common law, dispose of that property by will. She cannot destroy the husband's tenancy by the curtesy, nor can he devise away her dower.

We then will examine the wife's right to devise her personal property, at common law, premising, that when we find it laid down in our law books, that a woman cannot devise her real property, the statutes of *Hen.* VIII. are generally cited ;—with these statutes, as has already been shewn, we have nothing to do, in this question ;—premising, also, that we frequently find it said generally, that a woman cannot devise her personal property, *because it belongs to her husband.* With this principle we have no controversy ; for the right of devising never extends to the property of another.

In 2 *Black. Com.* 197,8, and in *Godolphin* 29, it is said, that there are several cases, in which a feme-covert may dispose of her personal property by will.

1. She may devise her *paraphernalia*, and her *rationabilis pars.* (*v*) This *rationabilis pars* is defined in 2 *Black. Com.* 132,3,4.

2. She may devise her choses in action. (*w*)

3. She may devise her property holden as executor, or in *auter droit.* (*x*)

(*v*) *Glanville* v. *Bracton*—*Reeve's History of English law*, 307. *Lyndewood*, cited in 4 *Reeve* 72, 73, 74.
(*w*) *Swinburn* 150,1. 1 *Mod.* 211.
(*x*) 1 *Mod.* 211. *Swinburn* 151—*Perkins* 220.

1805.

FITCH
v.
BRAINERD.

4. She may devise her separate estate. This is a consequence of the doctrine advanced. (y)

Thus, for nearly two hundred years, the right of a feme-covert to devise *her* personal estate, has been sanctioned by the English courts. This proves, that she is under no common law disability to devise.

It is said, in answer to these cases, that there is no such thing as separate property, by our law, in a feme-covert. If that be admitted, it does not militate against the argument. We are upon the question of the power to devise at common law ; and such power is clearly established, by the foregoing cases, and by many others, which might be cited.

But it is saying a great deal, to say that there can be no such thing as *separate* property, by our law. Are not jointures, and other covenants made in contemplation of marriage, by which the property of the man and woman is to be taken out of the general rules of law, very frequent ? Are they not extremely beneficial, in many cases? And have not our courts repeatedly established them? And will not the increase of personal property render them more and more useful ?

5. A feme-covert may execute a power over real estate, independent of her husband ; (z) yet if she be a *minor*, she cannot. This shews, that her disability is not absolute.

6. A will, containing a devise, by a feme-covert, of real

(y) *Cro. Car.* 219, *Mariot* v. *Kinsman*, in 1625. 1 *Vern.* 244,5, *Bletsow* v. *Sawyer*, in 1684. *Prec. Chan.* 255, *Gore* v. *Knight*, in 1705. 1 *Ves.* 298, 303, *Hearle* v. *Greenbank*, in 1749. 1 *Ves.* 517,8, *Grigby* v. *Cox*, in 1750. 2 *Ves.* 61,71, *Duke of Marlborough* v. *Lord Godolphin*, in 1750. 2 *Ves.* 190,1, *Peacock* v. *Monk*, in 1751. 1 *Bro. Ch. Ca.* 16,21, *Hulme* v. *Tenant*, in 1778. 1 *Ves. jun.* 46, *Fettiplace* v. *Gorges*, in 1789. S. C. 3 *Bro. Ch. Ca.* 8.
(z) 3 *Atk.* 695.

and personal estate, was holden good, as to the *personal* estate, but bad as to the *real* estate, *because of the statutes of Hen.* VIII. (a)

<div align="right">
1805.

FITCH
*v.*
BRAINERD.
</div>

7. In the case of *Compton* v. *Collinson*, (b) it was holden, that a wife may alienate by devise, and surrender *copy-hold* land, her husband having covenanted to join in a conveyance, and having, also, on separation, given up his right. Freehold estate he *holds in right of his wife* ;—of copy-hold, he has only the possession ;—the new surrender is made to her.

8. A wife may levy a fine of her land, and unless the husband reverse it, she and her heirs shall be bound. (c)

It is objected against this power in femes-covert, that before the statute of 34th of *Hen.* VIII. was enacted, they were disabled, by the common law, to devise lands ; and *Powell on Devises* 140 *and onwards*, is cited ; also, a case from *Brooks' Abr.* 230, where it was said to have been decided, that a custom for a married woman to devise land was bad.—To these cases may be opposed a case in *Moor* 123, cited by the judges in 2 *Wilson* 2, where the doctrine is thus laid down, that a custom to devise copy-hold lands, *without* the husband's assent, is bad, but *with* his assent, it is reasonable, and therefore good.

It is also said, that if our statute does not prohibit femes-covert from devising, then they are permitted to " give " their vote, verdict, or sentence in any matter or cause." To this it is sufficient to answer, that this argument equally destroys the right of a single woman to devise, unless those who urge it will contend, that single women may sit as jurors.

It is also strongly urged, that good policy is against the right in question. As this argument would introduce the

(a) 2 *Ves.* 190,1.   (b) 1 *Hen. Black.* 334.   (c) 10 *Coke* 43.

<div align="center">
**A a**
</div>

discussion of a question appropriate to another forum, it need not be answered here. When a court of justice leave a question of *law*, to inquire what *policy* dictates, they cease to be judges, and commence legislators, or politicians.

But, however this question might have been decided, twenty years ago, we contend, that it now ought to be considered at rest.

In 1786, the Superior Court adjudged, in the case of *Adams* v. *Kellogg* (d) that a feme-covert could not devise her real estate to her husband. This judgment was reversed, by the Court of Errors, in October, 1788, after an argument in May 1788, and a continuance to advise, and a further argument, in October. Among the gentlemen composing the Court of Errors, at that time, we may mention Governour HUNTINGTON and Doctor JOHNSON, whose names, where they were known, will give weight to a decision. In May, 1789, the question came before the legislature, between the same parties, on a petition for a new trial. Although there might be a sufficient reason for rejecting this petition, aside from the question, whether the decision was correct, yet the General Assembly went into the question of the power of a feme-covert to devise, and sanctioned the opinion before given by the Court of Errors. From that day to this, all the subordinate Courts, and the general body of the people, have considered the law as settled ; and numerous wills have been made, by the advice of the best counsel, and approbated by the Courts of Probate. It is not too much to say, that property to the amount of many hundred thousand dollars, is now holden by this title—Of course, to shake it, will induce all the evils, of which instability in decisions is productive.

By the above decision, and a conformity thereto, by all the Courts of Probate, the statute relating to wills, has been, for seventeen years, construed to give, or, at least not to take

(d) *Kirby* 195.

away, the power of a feme-covert, to devise her real estate. Is not this, then, our law?

The maxim that municipal law is that, " *quod quisquis populus sibi constituit,*" is universally admitted to be just. It is not to be doubted, that, upon this principle, the law of Connecticut is in favour of this devise. This decision, and all the practice under it, has been acquiesced in. The present writ of error is the only exception to this observation.

In anticipation of these remarks, it has been said, by the counsel for the plaintiff in error, that the case of *Adams* and *Kellogg* is the *only* instance, in which this doctrine has been established.—We answer,

1. That case has been followed with numerous cases in the lower Courts, so that its authority ought not to be questioned.

2. One decision of this Honourable Court must be deemed sufficient, or it will be difficult to know, when the law may be considered as settled.

3. If this objection be valid, how will the law stand upon a reversal? Contrary decisions of the highest Court of law can only distract and confound.

It is further said, that in the case of *Bradley* v. *Goodyear,* in 1803, this Court departed from a former decision. True;—but it will be remembered, *that* was a question respecting the admission of testimony, and the point then over-ruled was murmured at, by every lawyer at the bar. It had been decided some years before, that a plaintiff in the action of book debt, might, by his own oath, support a charge on book, of a sum of money paid on a note, or bond, and not indorsed.—In 1803, this decision was reversed; and to entire satisfaction.—Very different is the case

1805.

Fitch
*v.*
Brainerd.

of a precedent regarding titles to real estates. If the purchaser and seller cannot rely on the principles, solemnly, and deliberately pronounced, by the highest Courts of law, there will be little confidence placed in any guarantee, which can be given.

It is said, also, that precedents are to be regarded only as *illustrative* of principles. This together with the other objections, really amounts to this ; that every court must decide on every question, as though it were new ; and, of course, that all former decisions which do not square with the opinion of the judge, must yield to such opinion. Such a doctrine is fraught with mischief. The wisest man should discard it, for the obvious reason, that it will be made use of by those who are less wise.—A definite rule will be resorted to, by an upright judge, even if he doubts its rectitude, rather than that *every judge* should feel himself at liberty to decide arbitrarily. In conformity to these ideas, the ornaments of the English Courts have never hesitated to declare themselves bound by precedents.—They are not ashamed to say, we cannot legislate ;—we can, by industry, learn what those, who have gone before us, have decided, and there we will stand ;—we can tread *super antiquas vias,* but we are not at liberty to strike out new paths, because they appear more safe, or eligible.

If there be any truth in the maxim, *ubi lex est vaga, et incerta, ibi miserrima est servitus,* it applies, with great force, to a people, whose courts will not regard their own solemn decisions.

By the Court. The question is, can a feme-covert legally devise, or dispose of real estate by will ? What she may do with respect to personal estate, in certain cases, with the consent of her husband, or without, is not a part of this case, nor determinable on principles, which apply to it.

It being well understood, that a right to devise is not a natural, but municipal right, it must, so far as it exists, have a statute or custom for its creation. Has it had such creation in favour of a feme-covert, here, or in the country from which we emigrated ?

For though the common law of England hath not, *as such*, nor ever had, any force here ; yet, in the progress of our affairs, whatever was imagined at the beginning, it long since became necessary, in order to avoid arbitrary decisions, and for the sake of *rules*, which habit had rendered familiar, as well as the wisdom of ages matured, to make that law our own, by practical *adoption*—with such exceptions as a diversity of circumstances, and the incipient customs of our own country, required. The same may be said of ancient English statutes, not penal, whose corrective and equitable principles had become so interwoven with the common law, as to be scarcely distinguishable therefrom.

But does either the statute, or common law of England, recognize the right in question ? The only statutes which bear upon the case, those of 32d and 34th of *Hen.* VIII., which grant generally the right of devising, expressly except *femes-covert ;* negating, at once, the expediency of extending the right to them, and the fact of their having it before.

With respect to the common law, as it formerly stood, the uniform doctrine of elementary writers, and one which authorities well support, and well account for, is, that a feme-covert cannot devise—except by special custom : and even such custom has been adjudged ill, on the ground, that it could not have had a *reasonable* commencement.

Our own statute next to be considered, is, omitting the parenthesis of 1784,—" That all persons of the age of " twenty-one years, of right understanding and memory, " whether excommunicated or other, shall have full power,

" authority and liberty to make their wills and testaments, " and all other lawful alienations of their lands and other " estates ; and to give their vote, verdict, or sentence in any " matter or cause,"—Does it create the *right* of devising, or only declare the *age* competent for its exercise ? The former construction has been resorted to, but the latter best comports with the provisions of the statute throughout ; and is, indeed, the only one, that can rescue it from ridicule and absurdity. For, who will say, that all sane persons, twenty-one years old, females as well as males, and femescvoert as well as femes-sole, are qualified, in *all* respects, and have plenary authority, for all the acts there specified ? And if not qualified, in all respects, they must be deemed so only in respect of *age*. Any construction, other than one of these, would be wholly arbitrary.

It may, perhaps, afford further light to trace the statute to its origin, or as far as there are printed documents to guide us.

In 1672, the laws were collected from their scattered situation through the records, formed into an alphabetical digest, and for the first time printed. They bear the marks of momentary offspring—proceeding from difficulties that were *felt*, without much provision for such as were likely to occur, or much solicitude about future interpretation.— Among them is the following : " That all persons of the " age of twenty-one years, whether excommunicated or " other, and of right understanding and memory, shall have " full power and liberty to make their wills and testaments, " and other lawful alienations of their lands and estates."

By *all* persons here, can only be intended all *estateholders*. Such only can be the subjects of the power declared, which is to dispose of *their* estates. Femes-covert were not then estate-holders. For, in the preamble of an act of 1723, it was declared to be " a general custom," commencing from the beginning, and which, for the time past

was to be holden good, " that the real estate of any person, " which either by descent or will, became the estate of his " daughters, whether they were seised of it at the time of " their marriage, or whether it descended or came to " them during their coverture, became *thereby the proper* " *and sole estate of their husbands.*"

Again;—by " all persons" can only be understood, all such as could alienate *otherwise* than by will. Such only can be the subjects of the power declared ; for it is to make their wills and *other* alienations of their lands and estates. Such other alienations of lands and estates, femes-covert, if they had any, could not make before the statute, nor in consequence of it. They are not included in the statute, whatever it may amount to.—But what doth it for any description of persons ? Does it create the *right* to dispose of their estates in the manners mentioned, or, presupposing the existence of such right, only declare at what age there shall be full power for its exercise ?

The latter construction will satisfy the words of the statute ; and with it only will comport the clause " and *other lawful* alienations of their lands and estates." For it could not then be intended to create the right of such kind of alienation as was lawful before. Nor, indeed, is it supposable, that emigrants from England, where the right of alienating in both ways had been very long enjoyed, and who were not civilians to distinguish rights, which looked and felt like natural ones, from such as were strictly so,—that they would ever once doubt of their *right* to dispose of their estates as they pleased, by will or sale ; so as to require a statute for its creation. But they might doubt, and well doubt, when it would be expedient, in this country, for full age to commence ; which commences at different periods in different countries, and, with respect to devising, did, by reason of local customs, commence at different periods in the country they had left. And it is certain, that with respect to age as a qualification for divers acts, they did early depart from the

general practice in England, as also at different periods, from their own practice. So that the statute may be well accounted for, regarding it, not as a statute of *wills*, but of *age*.

It has, however, two provisions, not yet remarked upon. One includes the *excommunicated* in the benefits of the act, in common with others—protesting against that *civil law*, that governed in courts of which there had been too much experience. It denotes the age of the statute, and does little more.

The other provision respects persons under sentence of death, and is that they shall not " dispose of" their estates. But why, it may be asked, this provision, unless the statute had created the *right* to dispose of them? The answer is, in the first place, that as the right to *sell* certainly pre-existed the statute, the malefactor having now the statute age, might alienate, but for this restriction. Further, if the right to devise, as well as sell, was understood to pre-exist the statute, as has been shewn probable, then the malefactor, having the statute age, would be understood to be at liberty to alienate either way, but for this restriction. This provision, also, is therefore consistent with the construction assumed.

Subsequent to this statute, though brought forward in the same digest, is another, taking up the qualification of age more extensively. It is, " That the age for passing away " of lands, and such kind of heriditaments, or for giving vote, " verdict, or sentence in any civil courts or causes, shall not " be under twenty-one years : But in case of guardians, four- " teen years." This last act manifestly respects qualifications in point of *age* only. And as a further reason for supposing that the other respected that only, they are both, in the revision of 1702, incorporated into one,—as follows :

" That all persons of the age of twenty one years, and of

" right understanding and memory, whether excommunica-
" ted or other, shall have full power and liberty to make
" their wills and testaments, and all other lawful alienations
" of their lands, and all other estates : and for giving vote,
" verdicts, or sentence in any civil courts, or causes."

Here the predicating words " shall have *full power and*
" *liberty*," go to the cases enumerated in the last of the two
statutes, as well as to those in the first ; and as they can only
mean with respect to the latter, *shall be deemed of compe-
tent age*, they are restrained to that meaning with respect to
the former. The sense thus early, and thus authoritatively
given to the first statute, is conclusive.

The statute of 1702, is the same we have at present, ex-
cepting the clause of " not otherwise legally incapable," in-
serted in the revision of 1784,—a clause which neither adds
nor diminishes,but only expresses what must have always been
understood. Taking the statute literally,as it now reads, dis-
abilities other than those arising from defect of age, or from
excommunication, are not touched. That arising from *cover-
ture*, of course, is not, nor ever has been removed ;—so
far as we have yet seen.

It remains only to inquire, has there been, from the early
settlement of the state, a practice for femes-covert to de-
vise ; which might serve for a different exposition of the
statute, or might, as a custom, have acquired the force of
law ?

Of such a practice there are neither memorials nor tradi-
tion. And we can not presume from the condition of the
early settlers, and still less from their character, that they
would have introduced it. They, who could declare to the
world, as prefatory to their first code of laws, " *we have en-
" deavoured not only to ground our capital laws on the* WORD OF
" GOD, *but also all our other laws in the justice and equity held*

FITCH
*v.*
BRAINERD.

"*forth in that word, which is a most perfect rule,*" (*o*) would not be likely to swerve from the maxims of *unity and subjection*, attached, by sacred writers, to the matrimonial vow. They had not then the art of refining upon the institution of marriage, which they might have since learned in England ; and which has wrought up a system of separate property, separate management, and separate residence ;—at once, the cause, and effect, of licentiousness. But it is not necessary to presume against a practice, of which there is record evidence that it could not exist. For near a century, femes-covert had no estate to devise.—The custom for them to devise, if such it may be called, is very recent, as well as very limited—confined, so far as is known, to a few instances, and within the last twenty years.

There has, indeed, been one ultimate decision, of a divided court, in favour of the right in question, in the case of *Kellogg* and *Adams* ; but that decision, we are constrained to say, after much deliberation, was not law.

Whether the refinements of the present age, require a departure from the ancient law upon this subject ; or whether the supposed benefits of a change would countervail its obvious mischiefs, are legislative, not judicial questions.— In this case, the Court is unanimously of opinion, there must be a reversal.

(*o*) *Preface to Stat. edit.* 1672.